UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SHIRLEY-ANN and HERBERT LEU, | |
| Plaintiffs, | No. C07-510MJP |
| v. | ORDER |
| INTERNATIONAL BOUNDARY COMMISSION (U.S. SECTION), et al., | |
| Defendants. | |

In this case, about a concrete retaining wall built a few feet too close to the Canadian border, the Court is asked to decide whether the President of the United States has the authority to fire the United States Commissioner of the International Boundary Commission ("IBC"), and whether the Department of Justice ("DOJ") may represent the IBC or its U.S. Commissioner. The Court is asked to decide these matters with little historical guidance: it appears that no President has ever attempted to fire the head of a treaty-based organization. These issues come before the Court on three procedural motions — DOJ's motion for extension of time (Dkt. No. 8), Commissioner Dennis Schornack's motion to quash (Dkt. No. 23), and DOJ's motion to strike (Dkt. No. 48). Having considered the parties' papers, and having heard oral argument on the matter, the Court ORDERS as follows:

1) Commissioner Schornack has been effectively removed from his post, and Commissioner David Bernhardt is the new Acting U.S. Commissioner of the IBC.

2) Commissioner Schornack's challenge to DOJ's authority to represent the IBC and its U.S. Commissioner is moot.

ORDER – 1

3)       The Motion to Quash and Motion to Strike are DENIED. The Motion for Extension of Time is GRANTED. The parties have thirty (30) days to file a Joint Status Report and Defendants have sixty (60) days to respond to Plaintiffs' amended complaint.

## Background

This case arises from a dispute between the plaintiffs, Shirley-Ann and Herbert Leu, and the International Boundary Commission ("IBC"), a treaty-based binational commission that addresses boundary issues on the Canadian/American border, over a four-foot high retaining wall that the Leus built in their backyard near Blaine, Washington. Although within their property lines, the retaining wall encroaches three feet into a 20-foot "boundary vista" maintained by the IBC. (Dkt. No. 14, Schornack Decl. ¶ 24.) In February 2007, the U.S. Commissioner of the IBC, Dennis Schornack, and the Canadian Commissioner, Peter Sullivan, contacted the Leus regarding the retaining wall. (Id.) The Commissioners informed the Leus that their wall encroached on the boundary vista and requested that they cease all work on the wall. (Id.) The Commissioners and the Leus were unable to reach a resolution regarding removal of the wall. (Id.)

Plaintiffs threatened the IBC with a lawsuit and the IBC sought legal representation. In the 100-year history of the organization, no one had ever sued the IBC in the United States.[1] In addition, during Commissioner Schornack's tenure, the U.S. Government had not exercised influence or control over the day-to-day operations of the Commission. (Dkt. No. 14, Schornack Decl. ¶ 18.) In March 2007, Commissioner Schornack contacted the Office of the Legal Advisor at the State Department for legal advice and representation. (Dkt. No. 25, Schornack Decl. ¶ 6.) The State Department informed Commissioner Schornack that the IBC is independent of the State Department and that the State Department does not have authority to provide IBC with legal advice. (Id. ¶ 6 & Ex. 1.) Commissioner Schornack then contacted officials at the Department of Justice ("DOJ"), who agreed that DOJ would defend the "United States on behalf of the Commission in litigation." (Id. ¶

---

[1] The parties have informed the Court that two suits against the IBC have been filed in Canada.

ORDER – 2

7.) However, Commissioner Schornack claims that DOJ informed Commissioner Schornack that he would still need to obtain "international legal advice."[2] (Id. ¶ 7.) Commissioner Schornack retained Dr. Elliot Feldman of Baker & Hostetler LLP, to assist in representing the IBC and Commissioner Schornack and to provide legal advice regarding the Commission's authority under its governing treaties. (Id. ¶ 8.) It appears from the record that a government procurement officer, and for some time, the U.S. Attorney's office, agreed to that arrangement. (Id. ¶ 8.)

On April 6, 2007, the Leus, represented by the Pacific Legal Foundation, filed a complaint against the "U.S. Section" of the International Boundary Commission and against Commissioner Schornack in his official capacity, seeking declaratory and injunctive relief preventing IBC from destroying and removing the at-issue wall. On April 30, DOJ attorneys appeared on Defendants' behalf. (Dkt. No. 4.)

The relationship among Commissioner Schornack, DOJ, and Commissioner Schornack's private counsel quickly soured. As Commissioner Schornack stated in his declaration,[3] in late June 2007, Acting Assistant Attorney General Ron Tenpas threatened to alienate Commissioner Schornack and the Commission from substantive discussions about the Leu litigation as long as the Commission was represented by private attorneys. (Dkt. No. 25, Schornack Decl. ¶ 10; see also Tr. 36.) Mr. Tenpas apparently stated that the Commission could only be represented by attorneys who worked for the President, for the purpose of vindicating the interests of the United States. (Id. ¶ 13.) Commissioner Schornack was warned that he risked "personal exposure" if the Commission continued to be represented by private counsel.[4] (Id. ¶ 10.)

---

[2] At oral argument, Assistant U.S. Attorney Brian Kipnis argued that "[n]o one in the Justice Department, including myself, either authorized, directed, approved or ordered Mr. Schornack to retain [outside legal counsel]." (Tr. 34.)

[3] Neither Plaintiffs, nor attorneys for DOJ, have offered any evidence contradicting Commissioner Schornack's recollection of events.

[4] At oral argument, Assistant U.S. Attorney Kipnis stated that the issue of Commissioner Schornack's termination went up to the White House "because Mr. Schornack was no longer on the defense team." (Tr. 35-36, 43.) It is perplexing to the Court how Commissioner Schornack could ever be on a "different team" than the DOJ attorneys, given that the DOJ attorneys represented Commissioner

ORDER – 3

On July 5, Commissioner Schornack's team of private attorneys — Dr. Feldman, Michael Snarr, Michael McKay, and Kenneth Odza — filed notices of appearance in this case. On July 9, Commissioner Schornack was contacted by an assistant to the President, Luis Reyes, who questioned Commissioner Schornack's commitment to the President. (Id. ¶ 16-17.) Commissioner Schornack recalls that Mr. Reyes questioned his patriotism, his Republican credentials, and his understanding of a "unitary" form of government. (Id.) Mr. Reyes communicated that if Commissioner Schornack did not fire his private attorneys and follow the direction of the Department of Justice, he would recommend that the President request Commissioner Schornack's resignation. (Id. ¶ 18.) No request for a resignation was ever made.

Instead, on July 10, President George W. Bush, through an assistant, sent Commissioner Schornack a letter notifying him that his commission was terminated. (Id.) The letter states, in its entirety:

> Dear Mr. Schornack:
>
> Pursuant to the direction of the President, this is to notify you that your appointment as United States Commissioner of the International Boundary Commission (US and Canada) and Commissioner of the International Joint Commission, United States and Canada, is terminated effective immediately.
>
> I would like to extend my best wishes in your future endeavors.
>
> Sincerely,
> Liza Wright
> Assistant to the President for Presidential Personnel

(Id.) Commissioner Schornack responded by challenging the President's authority to terminate his commission. In a letter addressed to the President, Commissioner Schornack wrote:

> Dear Mr. President:
>
> I am in receipt of a facsimile, dated July 10, 2007, from Liza Wright, who wrote that she was acting pursuant to your direction. The note informs me that my appointment to the International Boundary Commission and the International Joint Commission "is terminated effective immediately." I am unable to recognize the authority of this communication because I do not believe that you would knowingly

---

Schornack and are bound by their ethical obligations as lawyers to represent their client's interests.

ORDER – 4

> act beyond your authority, outside the law, or to otherwise jeopardize the national security of the United States.
>
> Mr. President, you appointed me International Boundary Commissioner according to the Treaty of Washington of 1925. The Treaty specified that new commissioners may be appointed "upon the death, resignation, or other disability of either of them." Article IV. There is no other basis for appointment, nor any other basis for the creation of a vacancy on the Commission. There is no lawful presidential power to terminate the appointment of a commissioner.
>
> For months I have been urging the Department of Justice to recognize the paramount importance of our national security along the international border with Canada. Only the International Boundary Commission is empowered to keep the boundary clear and enable U.S. Border Patrol to operate; the course chosen by the Department of Justice would cripple the Commission, endanger our border and threaten law enforcement.
>
> Sadly, the Department of Justice has insisted on subordinating the law and national security to a campaign promoting private property rights, even to the smallest restrictions. Officials of the Department of Justice have threatened me for weeks because I have honored the oath I took before God to respect the international treaties and protect our borders.
>
> I respectfully request that this communication be reconsidered and rescinded. It has been a privilege but also a duty to serve, and I shall continue to do so until such time as there is a well-founded reason to do otherwise.
>
> With profound respect,
> Dennis Schornack

(Id., Ex. 3.) That same day, President Bush appointed David Bernhardt Acting Commissioner on the part of the United States on the IBC. (Dkt. No. 35, Bernhardt Decl. ¶ 1.) Acting Commissioner Bernhardt notified Commissioner Schornack's private attorneys of his appointment, and directed them to immediately cease all work on this case. (Id. ¶ 10, Ex. A.) The private attorneys continue to file papers on behalf of Defendants IBC and Schornack (hereinafter "Schornack Defendants").[5] The parties dispute which person — Dennis Schornack or David Bernhardt — is the rightful commissioner and which group of attorneys — the DOJ or the private attorneys — represents the Commission and its U.S. Commissioner.

---

[5] For the remainder of this order, the Court refers to the two groups of defendants in this case as the "Schornack" Defendants and the "Bernhardt" Defendants, to reflect the two individuals who purport to be the U.S. Commissioner of the IBC and their respective counsel.

ORDER – 5

Contemporaneously with the above listed events, the parties raised these and other issues through a number of different motions. In light of the "difficult questions of first impression" raised by Plaintiffs' complaint, on July 3, 2007, DOJ, purportedly representing Dennis Schornack and the IBC, requested that the Court extend the time to respond to Plaintiffs' complaint and to comply with the Court's Rule 26(f) scheduling order.[6] (Dkt. No. 8.) On July 5, the private attorneys, representing Dennis Schornack and the IBC, filed notices of appearance, a motion to dismiss, and a separately pleaded counterclaim. (Dkt. Nos. 9-15, 18.) On July 9, the Schornack Defendants filed an opposition to DOJ's motion for an extension of time. (Dkt. No. 19). On July 12, the Schornack Defendants filed a surreply requesting that the Court strike DOJ's motion for extension of time (Dkt. No. 22) and also filed a separate motion to quash all DOJ filings in this matter, including DOJ's notice of appearance. (Dkt. No. 23.) On July 25, the Court heard argument on the motion for an extension of time and motion to quash. Within a week after oral argument, Plaintiff moved to file an amended complaint (Dkt. No. 42), the Bernhardt Defendants filed a motion for judgment on the pleadings (Dkt. No. 47), and the Bernhardt Defendants filed a motion to strike all documents filed by Dennis Schornack's private attorneys (Dkt. No. 48).

In response to this flurry of motions, the Court, on August 9, issued a Minute Order prohibiting the parties from filing any additional documents in this case, except to allow the parties to respond to some of the previously filed motions. (Dkt. No. 56.) Because the Bernhardt Defendants' motion to strike raised issues similar to those discussed at oral argument, the Court ordered the parties to respond to that motion. The Court re-noted the motion for extension of time and motion to quash to coincide with the noting date of the motion to strike. (Id.) In a separate order, the Court granted Plaintiffs leave to amend their complaint and struck without prejudice the motions to dismiss and for judgment on the pleadings. (Dkt. No. 58.) Now fully briefed, the issues of whether the

---

[6] It appears from the record that DOJ attorneys filed this motion without consulting their client, Commissioner Schornack. (See Dkt. No. 19, at 3; see also Dkt. No. 25, Schornack Decl. ¶¶ 12-14.)

ORDER – 6

President has authority to remove Commissioner Schornack from his post and whether DOJ has authority to represent Defendants are ripe for the Court's consideration.

**Discussion**

At the outset, the Court acknowledges the difficult legal issues involved in this case. This case presents novel constitutional issues, whose complexity is exacerbated by issues involving treaty interpretation, deference to the Executive in matters of foreign policy, and jurisprudence regarding whether treaties grant privately enforceable rights. The Court explores the respective areas of the law and the strengths and weaknesses of each parties' position before reaching its conclusion.

**I.    Jurisdiction**

Plaintiffs and the Bernhardt Defendants argue that the Court does not have jurisdiction over Commissioner Schornack's grievance. They argue that Commissioner Schornack does not have standing to file a motion seeking affirmative relief because he is no longer a party to this suit. They argue that under Federal Rule 25(d), Commissioner Bernhardt has been automatically substituted as the defendant in this suit. See Fed. R. Civ. P. 25(d)(1) (providing that when a public officer is a party to an action in his official capacity and "ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party"). But this argument assumes the truth of the matter asserted, i.e. that Commissioner Schornack has "ceased to hold office."

Plaintiffs and the Bernhardt Defendants also argue that the Court does not have jurisdiction over all necessary parties and that the Western District of Washington is the wrong venue for Commissioner Schornack's "claims." The Court does not interpret Commissioner Schornack's position as a separate unlawful termination claim. To the extent that Commissioner Schornack makes allegations against the President, those allegations cannot be separated from this suit without the Court ruling on their merits. The Court therefore cannot avoid deciding the issue of which defendant is the actual defendant on jurisdictional grounds.

ORDER – 7

**II.     Presidential Removal Power**

In 2001, President Bush appointed Dennis Schornack "Commissioner on the part of the United States on the International Boundary Commission, United States and Canada ... during the pleasure of the President of the United States of America." (Dkt. No. 35, Bernhardt Decl. ¶ 14.) The general rule is that, under the Appointments Clause of the United States Constitution, U.S. Const. Art. II, § 2, cl.2, and the President's constitutional duty to "take care that the laws be faithfully executed," U.S. Const. Art. II, § 3, and absent a specific legislative provision to the contrary, the President can remove any officer whom he appoints. Myers v. United States, 272 U.S. 52, 161 (1926) (noting that the "power to remove ... is an incident of [the President's] power to appoint").

**A.     Removal Cases**

The Supreme Court has developed its removal jurisprudence through a series of cases. In Myers, the Court upheld the right of the President to discharge a postmaster even though Congress had limited the President's removal authority. 272 U.S. at 162-42. In Humphrey's Executor v. United States, the Supreme Court held that Congress may limit the President's power to remove officers from independent, quasi-judicial or quasi-legislative agencies. 295 U.S. 602, 629 (1935). Because the Federal Trade Commission Act limited removal of Federal Trade Commissioners to removal for specific causes enumerated in the Act, no removal could be made during the prescribed term of office (7 years), except for one or more of the enumerated causes. Id. at 631-32. The Court distinguished its previous removal cases on the grounds that they had involved purely executive officers (Myers) or had involved statutes that did not include a term of office (Shurtleff v. United States, 189 U.S. 311 (1903)). Id. at 623, 627-28.

In Wiener v. United States, the Court concluded that President Eisenhower did not have the authority to fire a member of the War Claims Commission, even though the operative statute did not expressly limit the president's removal power. 357 U.S. 349 (1958). Because Congress intended the War Claims Commission to be independent from the executive, no power to remove for political reasons could be implied by Congress's silence on the matter. Id. at 356. The Court suggested that it

may read into an otherwise silent statute a "for cause" requirement for removal. See id.; see also Federal Election Comm'n v. NRA Political Victory Fund, 6 F.3d 821, 826 (D.C. Cir. 1993) (suggesting in dicta that the Federal Election Commission's structure and mission as well as its commissioners' terms suggest that the President can remove the commissioners only for good cause even though the statute is silent as to the President's removal authority); SEC v. Blinder, Robinson & Co., 855 F.2d 677, 681 (10th Cir. 1988) (assuming without deciding that President's authority to remove SEC members is limited to removal for good cause despite statute's silence).

And in Morrison v. Olson, the Court considered whether a provision of the Ethics in Government Act of 1978, 28 U.S.C § 49 *et seq.*, which restricted the Attorney General's power to remove independent counsel appointed under the Act to instances in which he could show "good cause," impermissibly interfered with the President's exercise of his constitutionally appointed functions. 487 U.S. 654, 685 (1988). The Court held that such a limitation was constitutional because the restriction did not "impede the President's ability to perform his constitutional duty." Id. at 691. Thus, Congress could limit the President's power to remove the independent counsel, who investigates and prosecutes highranking Government officials for violations of federal criminal laws, because that office should be independent of the executive. Id. at 693.

In this case, Commissioner Schornack points to no statute that limits the President's power to remove him. Instead, he points to language in the two treaties that govern the IBC. That treaty language authorizes the President to appoint a new commissioner "upon the death, resignation, or other disability" of the former commissioner. The question here is whether that language effectively limits President Bush's authority to remove Commissioner Schornack from his commission.

**B.      Treaties of 1908 and 1925**

The International Boundary Commission of the United States and Canada was born from efforts dating back to the Jay Treaty of 1794 to delineate and mark the boundary between our neighboring countries. See Alec McEwan, The Value of International Boundary Commissions: The Canadian/American Experience, at 2 (prepared for conference on International Boundary

ORDER – 9

Management, IBRU, University of Durham, UK, September 2001) (filed with Court at Dkt. No. 32-2).  During the 19th Century, Britain and the United States established several *ad hoc* commissions to identify and mark the location of the international boundary in certain areas. Id.  In 1908, the two countries signed a treaty that established a commission to survey and mark the entire international boundary from the Atlantic Ocean to the Pacific Ocean. See Treaty Between the United States of America and the United Kingdom Concerning the Boundary Between the United States and the Dominion of Canada From the Atlantic Ocean to the Pacific Ocean (April 11, 1908) (hereinafter, "1908 Treaty") (filed at Dkt. No. 14, Ex. 1).  A 1925 treaty created a permanent commission to inspect and maintain the boundary, repair or replace boundary markers, keep the boundary vistas open, and to resolve boundary disputes between the two countries. See Treaty Between the United States of America and His Britannic Majesty, in Respect of the Dominion of Canada, to Define More Accurately at Certain Points and to Complete the International Boundary Between the United States and Canada and to Maintain the Demarcation of That Boundary (February 24, 1925) (hereinafter "1925 Treaty") (filed at Dkt. No. 14, Ex. 2).  The commission created consists of a Canadian and a United States commissioner, and their respective staff.  The commissioners are jointly empowered to enact the treaty mandates; expenses incurred by the commissioners in carrying out their duties are paid for equally by each government. Id., art. IV.

Both the 1908 and the 1925 treaties address how commissioner appointments shall be made.  The 1908 Treaty provides that "[i]n case a vacancy occurs in any of the Commissions constituted by this Treaty, by reason of the death, resignation, or other disability of a Commissioner, before the work of such Commission is completed, the vacancy so caused shall be filled forthwith by the appointment of another Commissioner by the party on whose side the vacancy occurs. . . ." 1908 Treaty, art. IX.  The 1925 Treaty provides that the commissioners appointed under the provisions of the 1908 Treaty "shall continue to carry out the provisions of this Article, and, upon the death, resignation, or other disability of either of them, the Party on whose side the vacancy occurs shall appoint an Expert Geographer or Surveyor as Commissioner, who shall have the same powers and

ORDER – 10

duties in respect to carrying out the provisions of this Article, as are conferred by this Article upon the Commissioner appointed under the provisions of the said Treaty of 1908." 1925 Treaty, art. IV.

Treaties are to be interpreted "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." Vienna Convention on the Law of Treaties art. 31, May 23, 1969, 1155 U.N.T.S. 331.  Here, the treaty is silent regarding removal of commissioners — it neither grants authority to remove a commissioner nor limits the President's power to do so.  The treaty language, however, suggests that the signatories envisioned limited opportunities for vacancies — a vacancy (for an American appointment) would only occur by the "death, resignation, or other disability" of the U.S. Commissioner.  Thus, the treaty language suggests that the President's removal power is restricted — the President cannot create a vacancy (i.e., remove a Commissioner) except by requesting the U.S. Commissioner's resignation, or by identifying some "other disability" that prevents the Commissioner from fulfilling his commission. The treaty language therefore suggests that commissioners have a lifetime tenure.

The purposes behind these treaties supports the Court's reading of the language.  The treaties were entered into to create a neutral Commission to define and maintain the international boundary after years of dispute over the boundary. (See Schornack Decl. ¶¶ 5-9.)  The Commissioners were intended to be expert surveyors and geographers who were jointly empowered and directed to inspect the various sections of the boundary line between the United States and Canada, to repair and rebuild damaged border monuments, to keep the boundary vistas open, to maintain an effective boundary line between the countries, and to resolve disputes between the governments over the location of the boundary. 1925 Treaty, art. IV.  The 1925 Treaty directs the Commissioners to jointly report to their respective governments at least once a year. (Id.)  These provisions create a binational organization that operates independently from the Canadian and American governments.  Thus, independent of the analysis in the removal cases, the language and purposes of the 1908 and 1925 Treaties support Commissioner Schornack's argument that he is insulated from the President's removal power.

ORDER – 11

**C.     Is the President's Removal Power Effectively Limited?**

The removal cases instruct that Congress may limit the President's removal power where independence from the executive is warranted. See Morrison, 487 U.S. at 693; Wiener, 357 U.S. at 356. Here, the language and purposes of the 1908 and 1925 Treaties suggest that the International Boundary Commission is an organization independent of the executive. Among other things, it is charged with resolving disputes between Canada and the United States over the location of the international boundary — a task that surely warrants independence from each country's political swings. Like with the FTC Commissioner in Humphrey's Executor and the independent counsel in Morrison, it is reasonable to believe that the party States intended to insulate the IBC from the President's removal power.

That said, for a number of reasons, the Court cannot conclude that the treaties have that intended effect here. First, the treaties do not contain a specific term of years for the U.S. Commissioners. As the Supreme Court stated in Shurtleff in 1903, and as is still true today, with the exception of federal judges, "no civil officer has ever held office by a life tenure since the foundation of the government." Shurtleff, 189 U.S. at 314. The Shurtleff Court cautioned against assuming that Congress intended to create a position with life tenure unless Congress "use[d] language that put that intention beyond doubt." Id. at 318. Here, the 1908 and 1925 Treaties (negotiated by the Executive and ratified by the Senate) do not contain language suggesting that Canada and the United States intended to create positions with lifetime appointments.

Second, the actual commission signed by President Bush stated that Commissioner Schornack's appointment is "during the pleasure of the President of the United States for the time being." (Bernhardt Decl. ¶ 14.) The D.C. Circuit has suggested in dicta that a commissioner is bound by the terms stated in the commissioning document, and is estopped from claiming that her termination violates the statute under which she was appointed. United States v. Wilson, 290 F.3d 347, 359 n.2 (D.C. Cir. 2002). In Wilson, President Clinton had appointed Victoria Wilson to the United States Commission on Civil Rights under a commission that expressly stated that the

ORDER – 12

appointment was "for the remainder of the term expiring November 29, 2001." Id. at 350. After November 29, then-elected President Bush appointed Wilson's successor. Id. The Commission continued to recognize Wilson on the theory that the statute under which she was appointed provided for six-year terms that ran with each commissioner. The United States sued and the D.C. Circuit ruled in favor of the United States, holding that the six-year term ran with the calendar, and that because Wilson was appointed to fill a vacancy created by the death of a former commissioner who had not ended his term, her commission was only for the remainder of her predecessor's six-year term. Id. at 361-62. In addition to its statutory analysis, the court noted that because Wilson "failed to challenge the terms of her commission prior to its expiration ... she is arguably bound by those terms, and estopped from asserting an alleged violation of [the statute]." Id. at 359 n.2. Likewise, Commissioner Schornack has presented no evidence suggesting that he ever objected to the terms in his commissioning document — specifically, that he serves at the pleasure of the President — and he therefore is arguably estopped from arguing that he is not terminable at will.

The Bernhardt Defendants argue that the President's decision to remove Commissioner Schornack and the commissioning document itself manifest the Executive's interpretation of his authority under the 1908 and 1925 treaties. The Bernhardt Defendants offer a letter from John Bellinger, Legal Adviser, U.S. Department of State, to Acting Assistant Attorney General Ronald Tenpas, in which Mr. Bellinger explains that the State Department interprets the treaties as neither limiting the President's removal power nor affording Commissioner Schornack any private rights. (Dkt. No. 50, Kipnis Decl., Ex. B.) The meaning given a treaty's terms by the State Department is generally entitled to great weight. El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); see also Cornejo v. County of San Diego, 2007 U.S. App. LEXIS 22616, at *20-21 n.12 (9th Cir. 2007); but see REST.3D FOREIGN RELATIONS LAW § 326 note 2 (noting that courts are less likely to defer to an Executive interpretation when that interpretation is

adopted by the Executive in relation to a particular case before the courts); <u>United States v. Lombera-Camorlinga</u>, 206 F.3d 882, 887 (9th Cir. 2000) (same).[7]

In addition, courts are generally hesitant to intrude on the President's powers in matters of foreign affairs. <u>See, e.g.</u>, <u>Dep't of Navy v. Egan</u>, 484 U.S. 518, 527 (1988). In <u>Egan</u>, the Supreme Court noted the "generally accepted view that foreign policy was the province and responsibility of the Executive" and the fact that courts have shown the "utmost deference" to the President in areas of Article II responsibilities. <u>Id.</u> The President has a "unique responsibility" for the conduct of foreign relations. <u>Sale v. Haitian Centers Council, Inc.</u>, 509 U.S. 155, 188 (1993). It cannot be disputed that the IBC's duties involve matters of foreign affairs or that President Bush has made his intentions and his understanding of his authority under the treaties clear.

Given the foreign policy implications, the Court also wonders whether this case falls within the political question doctrine. Arising from Article III's case or controversy requirement and separation of powers concerns, the political question doctrine counsels that some cases do not present the type of question that can be properly addressed by the judiciary. <u>See</u> <u>Made in the U.S.A. Found. v. United States</u>, 242 F.3d 1300, 1311-12 (11th Cir. 2001) (holding that the questions of whether certain kinds of international commercial agreements are treaties and whether the Treaty Clause represents the sole means of enacting such agreements into law are nonjusticiable political questions). The Supreme Court has developed a multi-factor inquiry for determining whether a question is a nonjusticiable political question. A court must ask whether the case involves:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches

---

[7] In addition, the Bernhardt Defendants argue that the Court should look to the "historical practice" of U.S. Commissioners stepping down when a new administration begins. <u>See</u> <u>Pocket Veto Case</u>, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in proper interpretation of constitutional provisions."). But it is not clear from the evidence that U.S. Commissioners <u>have</u> actually stepped down at the change of each administration. (<u>Compare</u> Bernhardt Decl., Ex. C <u>with</u> Dkt. No. 36, Ex. D). And even if they had, voluntary retirements at the change of administrations would not make any more clear the strength of the President's removal authority here.

ORDER – 14

>of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217 (1962); see also Goldwater v. Carter, 444 U.S. 996, 998 (1979) (Powell, J., concurring) (combining factors into three-part inquiry). Although neither party mentions the doctrine, because the issues presented are so intertwined with both the President's removal power and his authority over matters of foreign policy, this case arguably presents nonjusticiable political questions.

Most importantly, the Court concludes that the 1908 and 1925 Treaties do not avail Commissioner Schornack of any rights. Treaties and other international agreements generally do not create judicially enforceable individual rights. United States v. Emuegbunam, 268 F.3d 377, 389-90 (6th Cir. 2001) (quoting Head Money Cases, 112 U.S. 580, 598 (1884)). Courts often presume that the rights created by an international treaty belong to a State and that a private individual cannot enforce them. Id. "It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved." Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990) ("Treaties are designed to protect the sovereign interests of nations, and it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress.") (quoting United States v. Zabenah, 837 F.2d 1249, 1261 (5th Cir. 1988)). Whether characterized as a presumption, "the general rule is that 'international agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts ....'" Cornejo v. County of San Diego, 2007 U.S. App. LEXIS 22616, at *14 (quoting 2 RESTATEMENT 3D OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 907, cmt. a (1987)).

In limited circumstances, treaties can create individually enforceable rights. See id., at *14-15 & n.10 (listing cases). Whether or not treaty violations provide the basis for particular claims or defenses depends upon the particular treaty and claim involved. United States v. Lombera-Camorlinga, 206 F.3d 882, 885 (9th Cir. 2000) (en banc), cert. denied, 121 S. Ct. 481

ORDER – 15

(2000). Whether a treaty provides a right or requires that a remedy be made available to a private person is therefore a matter of treaty interpretation. See 2 REST.3D FOREIGN RELATIONS LAW § 907, cmt. a.

The 1908 and 1925 Treaties do not provide any rights intended for a commissioner's benefit nor do they indicate the availability of private remedies. The Court is guided in its analysis by the Ninth Circuit's recent decision in Cornejo v. County of San Diego and the Sixth Circuit's decision in United States v. Emuegbunam. In Cornejo, the Ninth Circuit considered whether Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, creates judicially enforceable rights that may be vindicated in an action brought under 42 U.S.C. § 1983. That Article states that foreign nationals shall be advised of their "right" to have a consular officer notified of their arrest, and that the arresting state must forward communications from the detainee to the consular post. 21 U.S.T. at 100-101. In interpreting the treaty, the Ninth Circuit held that although the language "arguably confers on an individual the right to consular assistance following arrest," given the "unmistakable focus" of the treaty — consular functions between States — Article 36 does not create any judicially enforceable rights. 2007 U.S. App. LEXIS 22616, at * 2, 19, 30. Likewise, in Emuegbunam, the Sixth Circuit considered whether the government's failure to notify a foreign national of his right to consular assistance provided grounds for dismissal of the indictment or reversal of his conviction on direct appeal. 268 F.3d at 386. The court held that the language of the treaty and its interpretation by the State Department both confirmed that the "rights" in Article 36 "belong to the party states, not individuals," and that therefore, the state's failure to notify Emuegbunam of his consular rights did not provide a basis to overturn his conviction. Id. at 392-94; see also United States v. Jimenez-Nava, 243 F.3d 192, 198-99 (5th Cir. 2001) (holding that Article 36 does not provide judicially enforceable individual rights and declining to apply exclusionary rule for Article 36 violation).

Unlike the language in Article 36, which "arguably confers on an individual the right to consular assistance following arrest," see Cornejo, 2007 U.S. App. LEXIS 22616, at *16 (quoting

ORDER – 16

Breard v. Greene, 523 U.S. 371, 376 (1998)), the language in the 1908 and 1925 Treaties does not even suggest that a commissioner has a "right" to his post, or that he has a "right" to a certain process for removal. Instead, the treaties define the powers and obligations of Canada and the United States in relation to appointment. Cf. id. The treaties obligate the States to appoint new commissioners and specify when a vacancy requiring appointment of a new commissioner occurs; the treaties do not confer any rights regarding removal or appointment that operate to the benefit of an individual commissioner. These treaties are technical prescriptions regarding the boundary lines between neighboring countries. They are focused, not on an individual's right to his commission,[8] but on the rather mundane work of maintaining a peaceful border — delineating and marking the boundary and keeping it free of obstructions.

### D. Conclusion

This case presents difficult issues and the parties have presented strong arguments on both sides. On the one hand, the 1908 and 1925 Treaties created an independent binational organization — it is reasonable that the party States intended to insulate the commissioners from the political swings of each countries' respective administration by limiting the power to remove the commissioners. Because independence from the Executive is warranted, this case is arguably more akin to Humphrey's Executor, Wiener, and Morrison, than to Shurtleff or Myers.

But any similarity to those cases is marginalized by the unique facts of this case. The 1908 and 1925 treaties do not create judicially enforceable individual rights regarding appointment or removal. The treaties create obligations between States that are enforceable through political and diplomatic channels, or by other remedies available in international law, not by individuals in domestic courts. See Medellin v. Dretke, 544 U.S. 660, 685 (2005) (O'Connor, J., dissenting) (explaining that where no privately enforceable rights are conferred by a treaty, "[t]he complainant must be the ...

---

[8] Commissioner Schornack contends that he is not bringing a unlawful termination claim or seeking any "rights" under the treaty. But that assertion is undermined by his central argument in this dispute — that the President does not have authority to fire him. These are two sides of the same coin — a coin that cannot benefit Commissioner Schornack's position here.

ORDER – 17

state, and any remedy is political, diplomatic, or between the states in international law"); Cornejo, 2007 U.S. App. LEXIS, at *19 n.11. In this case, it is Canada's exclusive right to protest, and as far as the Court is aware, Canada has not done so.[9] Because the language that arguably restricts the President's removal power is in a treaty, rather than a statute, and because treaties do not create judicially enforceable individual rights, the Court is left with no law that restricts the President's otherwise unfettered removal power.[10]

As suggested in Wiener, the Court could import a "for cause" limitation on the President's removal power. See Wiener, 357 U.S. at 356; see also Blinder, Robinson & Co., 855 F.2d at 681. But in light of all of the other factors weighing in favor of the President's authority in these matters, the Court concludes that to do so would be inappropriate. Matters of "foreign policy [are] the province and responsibility of the Executive." Egan, 484 U.S. at 529. Commissioner Schornack is

---

[9] Edward Alex Lee, Director of the Office of Canadian Affairs in the Department of State's Bureau of Western Hemisphere Affairs and also the current Acting Deputy Assistant Secretary of State for Canada and Mexico in the Western Hemisphere Bureau states in his declaration that Canada is not contesting Commissioner Schornack's removal:

> The Canadian Department of Foreign Affairs and International Trade has advised the United States Department of State that the Government of Canada considers the process of appointment, tenure, and termination of the U.S. Commissioner of the International Boundary Commission (U.S. and Canada) to be a matter within the sole purview of the U.S. Government, and the actions taken by the United States in this case to be consistent with the treaties.

(Dkt. No. 49, Lee Decl. ¶ 3.) But that statement is hearsay: the Court cannot rely on the State Department's recollection of the Canadian government's position on the matter. The Court is left with Canada's silence regarding Commissioner Schornack's removal and that silence suggests acquiescence.

[10] Although he analogizes his situation to cases such as Humprey's Executor and Wiener (in which a Congressional act was held to lawfully restrict the President's removal power), Commissioner Schornack alternatively argues that he is not an Officer of the United States or an inferior officer for Article II purposes. (See Dkt. No. 60, at 12.) He therefore suggests that he was not appointed under the President's Article II, § 2 appointment authority. The Court need not resolve the issue of whether Commissioner Schornack is an "officer" under Article II. Commissioner Schornack's strongest argument is that he is an inferior officer and that, under the Humprey's Executor line of cases, the President's removal power is restricted here. If Commissioner Schornack is not an officer, and therefore the Supreme Court's removal cases are inapplicable, Commissioner Schornack's only support for his argument that the President cannot remove him are the 1908 and 1925 Treaties themselves, which, as the Court already explained, cannot benefit him here.

ORDER – 18

arguably estopped from arguing that he was not an at-will employee because he never challenged the terms of his commission. See Wilson, 290 F.3d at 359 n.2.  And the Supreme Court has cautioned against approving of a commission with lifetime tenure. See Shurtleff, 189 U.S. at 316.  For all of these reasons, the Court concludes that Commissioner Schornack cannot effectively challenge the President's authority to remove him.  Commissioner Schornack's termination and Commissioner Bernhardt's subsequent appointment, are presumptively valid.

**III.     Representation by the Department of Justice**

The Schornack Defendants challenge the authority of the Department of Justice to represent the IBC and its U.S. Commissioner.  They contend that because the IBC is not a federal agency, and its U.S. Commissioner is not a federal officer, DOJ is not authorized under 28 U.S.C. § 516 to represent the defendants in this matter.

The Court need not resolve in the context of these motions the issue of whether the IBC is an agency or whether the U.S. Commissioner is a federal officer.  Commissioner Schornack is no longer a party to this litigation.  Commissioner Bernhardt has asked the DOJ to represent the defendants in this lawsuit, and it appears from Commissioner Bernhardt's declaration that Canadian Commissioner Sullivan concurs.[11]  (See Dkt. No. 51, Bernhardt Decl. ¶ 4.)  Moreover, 28 U.S.C. § 517 "plainly confers upon the Attorney General broad discretion in his decision to dispatch government lawyers to 'to attend to any ... interest of the United States.'" Hall v. Clinton, 285 F.3d 74, 80 (D.C. Cir. 2002) (quoting 28 U.S.C. § 517) (noting that 28 U.S.C. § 517 "appear[s] to permit representation [by the Department of Justice] of private individuals as long as a government interest is at stake").  In any

---

[11]     Commissioner Bernhardt states in his declaration: "Commissioner Peter Sullivan, the Canadian Commissioner, knows that I have directed attorneys Feldman, Snarr, McKay, and Odza to cease work on this lawsuit on behalf of the U.S. Commissioner and the Commission and that I have asked the Department of Justice to represent the defendants in this lawsuit. Commissioner Sullivan concurs with both actions." (Dkt. No. 51, Bernhardt Decl. ¶ 4.)  Again, this statement is hearsay; but as mentioned above, Canada's silence on the matter suggests acquiescence to DOJ's representation.

ORDER – 19

event, without a live controversy on the issue, the challenge to DOJ's authority to represent the defendants is moot.[12]

**Conclusion**

In the context of three procedural motions, the Court was asked to decide whether the President of the United States has the authority to remove the United States Commissioner of the International Boundary Commission, and whether the Department of Justice may represent the IBC or its U.S. Commissioner. The Court concludes that Commissioner Schornack has been effectively removed from his post and that Commissioner David Bernhardt is the new Acting U.S. Commissioner of the IBC. Because Commissioner Bernhardt requests legal representation from the Department of Justice, the issue of DOJ's authority to represent the IBC or its U.S. Commissioner is moot.

The Court does not find it necessary to strike any papers already filed. The motions to quash and to strike are therefore DENIED. The parties will move forward with litigating the original issues presented in Plaintiffs' complaint in a manner consistent with this order. The motion for an extension of time to respond to the complaint and to comply with the Court's Rule 26(f) scheduling order is GRANTED.

Within thirty (30) days of this order, the parties must provide the Court with a Joint Status Report that will allow the Court to set a case schedule in this matter. The Defendants have sixty (60) days from the date of this order to respond to Plaintiffs' amended complaint.

The clerk is directed to send copies of this order to all parties.

Dated this 12th day of October, 2007.

*[signature]*

Marsha J. Pechman
United States District Judge

---

[12] The Court therefore need not consider whether, as the Bernhardt Defendants contend, the private attorneys violated Federal Rules 7(b)(3) and 11(a) and Local General Rule 2(g)(3) by appearing in this matter without seeking or obtaining a substitution of counsel.

ORDER – 20